**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

PAUL V. CONTRERAS,                          ) Case No. CV 16-6650-JPR
                                            )
                    Plaintiff,              )
                                            ) **MEMORANDUM DECISION AND ORDER**
          v.                                ) **AFFIRMING COMMISSIONER**
                                            )
NANCY A. BERRYHILL, Acting                  )
Commissioner of Social                      )
Security,                                   )
                                            )
                    Defendant.              )
_____             )

**I.    PROCEEDINGS**

Plaintiff seeks review of the Commissioner's final decision denying his application for Social Security disability insurance benefits ("DIB"). The parties consented to the jurisdiction of the undersigned U.S. Magistrate Judge under 28 U.S.C. § 636(c). The matter is before the Court on the parties' Joint Stipulation, filed April 18, 2017, which the Court has taken under submission without oral argument. For the reasons stated below, the Commissioner's decision is affirmed.

## II.   BACKGROUND

Plaintiff was born in 1965.  (Administrative Record ("AR") 148.)  He graduated from high school (AR 32) and worked as an insurance agent (AR 54, 180).

On November 15, 2013, Plaintiff filed an application for DIB, alleging that he had been unable to work since August 21, 2013, because of traumatic brain injury, memory loss, migraine headaches, blurred vision, dizzy spells, loss of balance, and injuries to his right arm, neck, back, knees, and feet.  (AR 59-60, 148-49.)  After his application was denied initially and on reconsideration (AR 59-83), he requested a hearing before an Administrative Law Judge (AR 97).  A hearing was held on April 1, 2015, at which Plaintiff, who was represented by counsel, testified, as did a vocational expert.  (AR 25-58.)  In a written decision issued May 29, 2015, the ALJ found Plaintiff not disabled.  (AR 7-21.)  Plaintiff requested review from the Appeals Council, and on July 7, 2016, it denied review.  (AR 1-3.)  This action followed.

## III. STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole.  See id.; Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion.  Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).

It is more than a scintilla but less than a preponderance. Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)). To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1996). "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for the Commissioner's. Id. at 720-21.

## IV.  THE EVALUATION OF DISABILITY

People are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or has lasted, or is expected to last, for a continuous period of at least 12 months. 42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

### A.  The Five-Step Evaluation Process

The ALJ follows a five-step sequential evaluation process to assess whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4); Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1996) (as amended). In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied. § 404.1520(a)(4)(i).

If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine

whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, the claimant is not disabled and his claim must be denied. § 404.1520(a)(4)(ii).

If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments set forth at 20 C.F.R. part 404, subpart P, appendix 1; if so, disability is conclusively presumed. § 404.1520(a)(4)(iii).

If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[1] to perform his past work; if so, he is not disabled and the claim must be denied. § 404.1520(a)(4)(iv). The claimant has the burden of proving he is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets that burden, a prima facie case of disability is established. Id.

If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because he can perform other substantial gainful work available in the national economy. § 404.1520(a)(4)(v); Drouin, 966 F.2d at 1257. That determination comprises the fifth and final step in the

---

[1] RFC is what a claimant can do despite existing exertional and nonexertional limitations. § 404.1545; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

sequential analysis. § 404.1520(a)(4)(v); <u>Lester</u>, 81 F.3d at 828 n.5; <u>Drouin</u>, 966 F.2d at 1257.

B.    <u>The ALJ's Application of the Five-Step Process</u>

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since August 21, 2013, the alleged onset date. (AR 12.)  At step two, he concluded that Plaintiff had the severe impairment of chronic headaches.[2]  (<u>Id.</u>)  At step three, he determined that Plaintiff's impairment did not meet or equal a listing. (AR 16.)

At step four, the ALJ found that Plaintiff had the RFC to perform light work except that he "can sit, stand or walk for six hours out of an eight-hour workday; [he] can frequently climb and balance; [and he] can occasionally climb ladders, ropes or scaffolds, stoop, kneel, crouch or crawl." (<u>Id.</u>)  Based on the VE's testimony, the ALJ concluded that Plaintiff could perform his past relevant work as an insurance agent, both as he actually performed it and as it is generally performed in the regional and national economy. (AR 20.)  Accordingly, he found Plaintiff not disabled. (AR 21.)

**V.    DISCUSSION**

Plaintiff argues that the ALJ erred in (1) assessing the credibility of his subjective symptom statements and (2) determining his RFC. (<u>See</u> J. Stip. at 4-11.)[3]

_____

[2] Plaintiff does not challenge the ALJ's step-two findings, specifically, his failure to find any of Plaintiff's other alleged impairments "severe."

[3] Plaintiff purports to raise one issue, "[w]hether the ALJ's physical residual functional capacity assessment is supported by substantial evidence" (J. Stip. at 4), but he also appears to contest the ALJ's credibility findings, which he

5

A.  The ALJ Properly Assessed the Credibility of

Plaintiff's Subjective Symptom Statements

Plaintiff argues that the ALJ failed to articulate legally sufficient reasons for rejecting his subjective complaints.  (J. Stip. at 9- 11.)  For the reasons discussed below, the ALJ did not err.

1.  Applicable law[4]

An ALJ's assessment of the credibility of a claimant's allegations concerning the severity of his symptoms is entitled to "great weight."  See Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989); Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1986). "[T]he ALJ is not required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)."  Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (citing Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)).

In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis.  See Lingenfelter, 504 F.3d at 1035-36.  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment [that] could reasonably be expected to produce the pain or other symptoms alleged."  Id. at 1036.  If such objective medical evidence exists, the ALJ may not reject a claimant's

_____

identifies as a "separate and distinct" issue (id. at 9-10).  The Court addresses the issues separately.

[4] Social Security Ruling 16-3p, 2016 WL 1119029, effective March 28, 2016, rescinded SSR 96-7p, 1996 WL 374186 (July 2, 1996), which provided the framework for assessing the credibility of a claimant's statements.  SSR 16-3p was not in effect at the time of the ALJ's decision on May 29, 2015, however.

testimony "simply because there is no showing that the impairment can reasonably produce the degree of symptom alleged." Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996) (emphasis in original).

If the claimant meets the first test, the ALJ may discredit the claimant's subjective symptom testimony only if he makes specific findings that support the conclusion. See Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010). Absent a finding or affirmative evidence of malingering, the ALJ must provide "clear and convincing" reasons for rejecting the claimant's testimony. Brown-Hunter v. Colvin, 806 F.3d 487, 493 (9th Cir. 2015) (as amended); Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1102 (9th Cir. 2014). The ALJ may consider, among other factors, (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; (4) the claimant's work record; and (5) testimony from physicians and third parties. Rounds v. Comm'r Soc. Sec. Admin., 807 F.3d 996, 1006 (9th Cir. 2015) (as amended); Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002). If the ALJ's credibility finding is supported by substantial evidence in the record, the reviewing court "may not engage in second-guessing." Thomas, 278 F.3d at 959.

## 2. Relevant background

In his function report dated December 19, 2013, Plaintiff stated that he suffered from "[h]eadaches, [d]izzyness [sic], [and] [b]lurred vision"; "bad" knees and feet and a "bad" neck and right arm; a traumatic brain injury; and an inability to concentrate or keep his balance. (AR 168.) He went "to the [Veterans Administration] Hospital almost everyday for P/T and [traumatic brain injury] stuff." (AR 169.) He could prepare his own food, clean his room, do laundry, drive a car, shop in stores and by computer for food and clothing, and handle money. (AR 170-71.) He went outside "4 to 5 times a week" for his various appointments at the Long Beach VA medical center. (AR 171.) For hobbies, he watched television and built models, although "it take[s] about a month or longer" for him to build one. (AR 172.) His impairments affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, remember, concentrate, understand, and follow instructions. (AR 173.) He did not know how long he could walk before needing to rest, but when he did rest he needed 10 to 15 minutes before he could resume walking. (Id.) He could concentrate for only "about 5 minutes." (Id.) He indicated that a cane, "brace/splint," and "glasses/contacts" had all been prescribed to him by a doctor, and that he used them "all the time." (AR 174.)

At the April 1, 2015 hearing, Plaintiff testified that he left his last two jobs — as an insurance agent in 2011 and temporary telemarketer in 2013 — because he was unable to concentrate. (AR 35.) He testified that he had "balance problems," "migraines all the time," "neck pain," and "nerve

damage" in his left arm; he had never had surgery — orthopedic or otherwise — and he took Vicodin and Naproxen for his pain.[5]  (AR 36.)  He was scheduled to have an epidural shot in his back in July 2015.  (AR 40.)  He had to hold onto a bar when he took a shower because of his "balance issues."  (AR 41.)  When he was not attending sessions at the VA, Plaintiff spent his day on his back, trying not to strain it.  (AR 42.)  He fractured his right arm "in the 90's," before he started military service.  (AR 44-45.)  He has had constant, debilitating headaches since he "left the military."  (AR 46-47.)  He could lift only five pounds without pain, walk only 30 yards without having to take a break, and sit for only 15 to 20 minutes.  (AR 47-49.)  He testified that he had pain in the "three middle fingers on both hands," rendering him unable to open a water bottle "on some days" and causing pain when he tried to type.  (AR 49-50.)  He testified that his doctor prescribed a cane "over a year" ago for his "balance issues."  (AR 51.)  He claimed that his anxiety and headaches made him unable to "function properly" in the workplace.  (AR 52.)

---

[5] Vicodin is the brand name of a combination of acetaminophen and hydrocodone.  See Hydrocodone Combination Products, Medline Plus, https://medlineplus.gov/druginfo/meds/a601006.html (last updated Jan. 15, 2017); Naproxen is an NSAID used to relieve pain, tenderness, swelling, and stiffness caused by various types of arthritis.  Naproxen, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681029.html (last updated July 15, 2016).

3.  <u>Analysis</u>

The ALJ found that Plaintiff's "subjective complaints are less than fully credible" (AR 20) and that although his "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms," his "statements concerning the intensity, persistence and limiting effects" were not credible to the extent they were inconsistent with his RFC (AR 19).

Plaintiff argues that the ALJ failed to give sufficient reasons for rejecting his subjective complaints.[6] (J. Stip. at 9.) As an initial matter, the ALJ afforded some weight to Plaintiff's subjective complaints of decreased physical functioning: he limited him to "no more than occasional climbing ladders, ropes[,] or scaffolds, stooping, kneeling, crawling[,] or crouching." (AR 20; <u>see</u> AR 16.) As discussed below, to the extent the ALJ rejected Plaintiff's subjective complaints of physical impairment, however, he provided clear and convincing reasons for doing so.

First, the ALJ found that some of Plaintiff's activities of daily living were "the same as those necessary for obtaining and maintaining employment" and were "inconsistent with the presence of an incapacitating or debilitating condition." (AR 18.) Plaintiff stated that he was able to prepare his own food, clean his room, do his own laundry, drive a car, shop in stores and on

_____

[6] Plaintiff objects to the ALJ's credibility assessment only as to his alleged physical impairments; he does not contest any credibility assessment related to mental symptoms. (<u>See</u> J. Stip. at 9-11.)

the Internet for food and clothing, build models, and handle money. (AR 170-72.) He went outside "4 to 5 times a week" for his various VA appointments (AR 171) and reported that he was attending computer classes three days a week (AR 287). The "reasonably normal" daily tasks of keeping a space clean, attending appointments daily, handling money, attending school, and preparing simple meals are inconsistent with Plaintiff's allegation that he is unable to "function properly." See, e.g., Amezquita v. Colvin, No. CV 15-0188-KES, 2016 WL 1715163, at *7 (C.D. Cal. Apr. 28, 2016) ("That Plaintiff maintained a reasonably normal level of daily activities was a clear and convincing reason to discount his credibility, even if his impairments made those activities somewhat more challenging."). An ALJ may properly discount the credibility of a plaintiff's subjective symptom statements when they are inconsistent with his daily activities. See Molina, 674 F.3d at 1112 (ALJ may discredit claimant's testimony when "claimant engages in daily activities inconsistent with the alleged symptoms" (citing Lingenfelter, 504 F.3d at 1040)). "Even where those [daily] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." Id. at 1113.

Second, the ALJ noted that Plaintiff received "grossly conservative treatment" and that his "medical records" showed "minimal positive objective findings, including negative diagnostic imaging" and "negative neurological examinations." (AR 18.) Indeed, as discussed in Section V.B., doctors and

medical staff consistently recommended conservative treatment for
Plaintiff's allegations of pain, and his medical records are rife
with normal or negative imaging and test results.  This was a
valid consideration in rejecting Plaintiff's subjective claims of
more debilitating impairments.  See Burch v. Barnhart, 400 F.3d
676, 681 (9th Cir. 2005) ("Although lack of medical evidence
cannot form the sole basis for discounting pain testimony, it is
a factor that the ALJ can consider in his credibility
analysis."); Parra, 481 F.3d at 751 (conservative treatment is
legitimate reason for ALJ to discredit claimant's allegations of
disability); Walter v. Astrue, No. EDCV 09-1569 AGR, 2011 WL
1326529, at *3 (C.D. Cal. Apr. 6, 2011) (medication, physical
therapy, and single injection amounted to "conservative
treatment").

Finally, the ALJ noted that according to Plaintiff his
debilitating conditions began in the 1990s, but he was able to
work as an insurance agent until 2011.  (AR 17-19, 54.)  At the
hearing, the ALJ noted that Plaintiff was apparently able to work
"for 20, 25 years" even though he had suffered from debilitating
chronic headaches "ever since [he] left the military."  (AR 47.)
Plaintiff confirmed that he had "always had a constant headache."
(Id.)  Further, Plaintiff acknowledged that he had suffered from
low-back pain since 1994 (AR 40); broken his right arm before he
started his military service, reinjured it during service, and
had had no injuries to it since then (AR 44-45); had pain in his
feet "since the military" (AR 48-49); and had had bilateral knee
pain since 1992 (AR 51-52).  Nothing in the record other than
Plaintiff's subjective statements demonstrates that those

conditions had worsened significantly since he stopped working. The ALJ properly took into consideration the fact that Plaintiff was apparently able to work for many years while suffering from the same impairments he now alleges make him incapable of work. See Alexander v. Comm'r of Soc. Sec., 373 F. App'x 741, 744 (9th Cir. 2010) (in discrediting allegations of disabling symptoms, ALJ properly considered claimant's ability to work after fibromyalgia diagnosis but seven years before alleged onset date).

In sum, the ALJ provided clear and convincing reasons for finding Plaintiff's subjective symptom allegations not credible. Because those findings were supported by substantial evidence, this Court may not engage in second-guessing. See Thomas, 278 F.3d at 959. Plaintiff is not entitled to remand on this ground.

B. The ALJ Properly Determined Plaintiff's RFC

Plaintiff contends that the ALJ erred in relying on the opinions of state-agency doctors E. Christian and L.C. Chiang in finding that he was physically capable of modified light work because "[t]he medical evidence as a whole" demonstrated that he was not. (J. Stip. at 5.) Plaintiff further argues that the ALJ erred in relying on the state-agency doctors because they failed to account for his "need to ambulate with a cane"; his "lumbar spine condition," which "has impacted his ability to engage in sitting activities"; "any cervical spine restrictions"; and "the frequency and duration of rest breaks required as a result of [his] chronic headaches." (Id. at 8.) For the reasons discussed below, remand is not warranted.

1.    _Applicable law_

A claimant's RFC is "the most [he] can still do" despite the impairments and related symptoms that "may cause physical and mental limitations that affect what [he] can do in a work setting." § 404.1545(a)(1). A district court must uphold an ALJ's RFC assessment when the ALJ has applied the proper legal standard and substantial evidence in the record as a whole supports the decision. _Bayliss v. Barnhart_, 427 F.3d 1211, 1217 (9th Cir. 2005). The ALJ must consider all the medical opinions "together with the rest of the relevant evidence [on record]." § 404.1527(b);[7] _see also_ § 404.1545(a)(1) ("We will assess your residual functional capacity based on all the relevant evidence in your case record.").

Three types of physicians may offer opinions in Social Security cases: (1) those who directly treated the plaintiff, (2) those who examined but did not treat the plaintiff, and (3) those who did neither. _Lester_, 81 F.3d at 830. A treating physician's opinion is generally entitled to more weight than an examining

---

[7] Social Security regulations regarding the evaluation of opinion evidence were amended effective March 27, 2017. When, as here, the ALJ's decision is the final decision of the Commissioner, the reviewing court generally applies the law in effect at the time of the ALJ's decision. _See_ _Lowry v. Astrue_, 474 F. App'x 801, 805 n.2 (2d Cir. 2012) (applying version of regulation in effect at time of ALJ's decision despite subsequent amendment); _Garrett ex rel. Moore v. Barnhart_, 366 F.3d 643, 647 (8th Cir. 2004) ("We apply the rules that were in effect at the time the Commissioner's decision became final."); _Spencer v. Colvin_, No. 3:15-CV-05925-DWC, 2016 WL 7046848, at *9 n.4 (W.D. Wash. Dec. 1, 2016) ("42 U.S.C. § 405 does not contain any express authorization from Congress allowing the Commissioner to engage in retroactive rulemaking"). Accordingly, citations to 20 C.F.R. § 404.1527 are to the version in effect from August 24, 2012, to March 26, 2017.

physician's, and an examining physician's opinion is generally
entitled to more weight than a nonexamining physician's.  Id.;
see § 404.1527(c)(1).

This is so because treating physicians are employed to cure
and have a greater opportunity to know and observe the claimant.
Smolen, 80 F.3d at 1285.  But "the findings of a nontreating,
nonexamining physician can amount to substantial evidence, so
long as other evidence in the record supports those findings."
Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996) (per curiam).

In making an RFC determination, the ALJ should consider
those limitations supported by the record and need not take into
account properly rejected evidence or subjective complaints.  See
Bayliss, 427 F.3d at 1217 (upholding ALJ's RFC determination
because "the ALJ took into account those limitations for which
there was record support that did not depend on [claimant]'s
subjective complaints"); Batson v. Comm'r of Soc. Sec. Admin.,
359 F.3d 1190, 1197 (9th Cir. 2004) (ALJ not required to
incorporate into RFC those findings from physician opinions that
were "permissibly discounted").  The ALJ considers findings by
state-agency medical consultants and experts as opinion evidence.
§ 404.1527(e).  The Court must consider the ALJ's decision in the
context of "the entire record as a whole," and if the "'evidence
is susceptible to more than one rational interpretation,' the
ALJ's decision should be upheld."  Ryan v. Comm'r of Soc. Sec.,
528 F.3d 1194, 1198 (9th Cir. 2008) (citation omitted).

"To find that a hand-held assistive device is medically
required, there must be medical documentation establishing the
need for a hand-held assistive device to aid in walking or

standing, and describing the circumstances for which it is needed." SSR 96-9p, 1996 WL 374185, at *7 (July 2, 1996); see Durfee v. Berryhill, C.A. No. 16-079M, 2017 WL 877272, at *5 (D.R.I. Feb. 15, 2017) ("a cane should not be woven into the RFC or the VE hypothetical just because a claimant prefers to use it or finds it helpful"), accepted by 2017 WL 875825 (D.R.I. Mar. 3, 2017). Use of a cane, when medically required, "may 'significantly erode' the occupational base for an individual who must use such a device." Cano v. Colvin, No. CV 14-4397-E, 2015 WL 10945616, at *4 (C.D. Cal. Jan. 26, 2015) (citing SSR 96-9p, 1996 WL 374185, at *7). Use of a cane may limit a claimant's ability to perform light work, but it is less likely to preclude sedentary work. See Harris v. Astrue, No. CV 08-2726 AJW, 2009 WL 2912655, at *4 n.5 (C.D. Cal. Sept. 8, 2009) (even when medically required, use of cane does not preclude sedentary work); White v. Astrue, No. 09 C 6612, 2011 WL 5373971, at *8 (N.D. Ill. Nov. 7, 2011) (discussing vocational expert's opinion that cane use in dominant hand precluded jobs "at the light level"). But see Alsyouf v. Astrue, No. EDCV 11-1867 SS, 2013 WL 327794, at *7 (C.D. Cal. Jan. 29, 2013) (discussing vocational expert's testimony that adding requirement for cane "whenever standing or walking" would not preclude performance of light-work job).

## 2. Relevant background

Between June 2013 and March 2015, with the exception of a trip to Vietnam from September to December 2014, Plaintiff visited the Long Beach VA medical center regularly, sometimes

four times a week, for kinesiotherapy,[8] physical therapy, group and individual psychotherapy, occupational therapy, psychiatry, tai chi, and various other group-therapy sessions.

During his initial "physical medicine rehab consult," on August 6, 2013, Plaintiff complained of "neck pain, ankle pain, and foot [pain]" and reported pain in his "lower back" and "frequent loss of balance." (AR 385-86.) After reviewing an x-ray of Plaintiff's cervical spine from June 25, 2013 (AR 386), the doctor discussed with him "the possible role of [alcohol]" in his history of falling (AR 387) and recommended physical-therapy sessions two or three times a week, use of ice and heat, a home exercise program, use of a TENS unit, and a trial of cervical traction therapy (AR 388). Plaintiff requested "a cane for balance issues" and was referred to a kinesiotherapist. (AR 388.) Although "[h]e did not display any signs of balance issues," he was issued one. (AR 384-85.) In a physical-therapy assessment on August 28, 2013, the therapist noted that Plaintiff "uses a [single-point cane] for safety after having fallen down the stairs," but she did not find that Plaintiff had a medical need for a cane, instead noting that his "Ambulatory/Prosthetic Equipment Needs" were "tba"; the plan for physical therapy was that he "[r]eturn to community distance ambulation with or without" an assistive device. (AR 374-76.)

In a September 25, 2013 consultation to assess a possible traumatic brain injury, Plaintiff alleged that he had been "hit

---

[8] Kinesitherapy, or kinesiotherapy, is physical therapy involving motion and range-of-motion exercises. Stedman's Medical Dictionary 950 (27th ed. 2000).

in the head by a rucksack weighing about 65 pounds" during an
army training exercise in 1992.  (AR 355-56.)  He remained on
military duty after the incident but "started having balance
problems and headaches."  (AR 356.)  He has had chronic headaches
since the incident.  (AR 355.)  He reported that in 1998 he "lost
his balance and fell"; he fell again in 2013, "with head trauma"
but "no change."  (<u>Id.</u>)  A physical examination revealed "[n]o
obvious gait abnormality . . . while walking at a normal pace
with appropriate arm swing, appropriate heel strike"; he was
"[a]ble to ambulate on toes and heels."  (AR 358.)  A Romberg
test was negative.[9]  (<u>Id.</u>)  No cane was mentioned.  (<u>Id.</u>)

Plaintiff had an audiology consultation on October 11, 2013;
he complained of "gradual hearing loss in both ears" (AR 333) but
was found to have "[e]ssentially normal hearing sensitivity" with
"normal" hearing "through the speech frequencies" (AR 334).
During an occupational-therapy session on October 16, 2013,
Plaintiff reported that he had "just purchased a bicycle and has
gone for a test drive" (AR 330-31); at his next appointment, on
October 28, he reported that he "was counseled by Physical
Therapy to avoid riding it due to balance issues" (AR 317-18).
The occupational therapist recommended that he increase his daily
walking; Plaintiff "stated that he would agree to this goal, but
that probably he would not meet the goal because he didn't feel
like it."  (AR 320.)  In a November 7, 2013 speech-pathology
consultation, Plaintiff reported that he was attending "computer

---

[9] In a Romberg test, the subject stands "with feet
approximated . . . [and] with eyes open and then closed."
<u>Stedman's</u>, <u>supra</u>, at 1640.  "[I]f closing the eyes increases the
[subject's] unsteadiness, . . . the sign is positive."  <u>Id.</u>

classes" three times a week but had difficulty with his memory. (AR 287.)  In a series of tests during an audiology consultation on December 24, 2013, Plaintiff's results were "consistent with normal VNG findings."[10]  (AR 568-69.)

Plaintiff began psychotherapy group sessions in December 2013 (AR 246-47) and started individual psychotherapy sessions in January 2014 (AR 541-49), which he continued until July 2014, when he "reported an improvement in his mood and ability to function more effectively" (AR 789).  He responded well to heat therapy and stretching during his physical-therapy sessions (see, e.g., AR 244, 245-46, 255-56, 275-76, 285-86, 304-05, 313, 317) but was noted to be noncompliant with his home exercise program (see, e.g., AR 260, 490, 512).  His occupational-therapy sessions were focused on relaxation and breathing techniques, and he was advised to exercise and increase his activity level. (See AR 238-41, 263-66, 272-75, 661-63, 688-90.)  He was an active participant in his weekly hour-long tai chi classes.  (See, e.g., AR 237, 244, 285, 467, 474, 484, 491, 508, 522, 554, 565, 634, 641, 644, 664, 668, 718, 735, 759, 856.)  Plaintiff started regular kinesiotherapy sessions in March 2014 (AR 494-97), which continued until June 2014 (AR 805-07).  He had regular appointments with a psychiatrist (see, e.g., AR 248, 294-95, 471-72, 566-67, 659-60) and attended group-therapy classes on a variety of topics, including chronic-pain management (see, e.g.,

---

[10] Videonystagmography, or VNG, is a test used to determine whether an ear disease may be causing a balance or dizziness problem.  Nat'l Dizzy & Balance Center, Videonystagmography, http://www.nationaldizzyandbalancecenter.com/services/balance-lab-testing/videonystagmography/ (last visited June 20, 2017).

AR 628, 640, 646, 667), "thoughts, feelings, and behavior" (AR 740), insomnia (AR 631), sleep (AR 651), anxiety and depression (AR 639), diabetes (AR 451), and tinnitus management (AR 629). He attended "integrative health and healing" sessions — which involved "healing touch," "aromatherapy," breathing and relaxation exercises, and music therapy — and he reported that they were effective. (See, e.g., AR 455, 766, 783, 808-09.)

Although he was observed to use a single-point cane for balance at many of his visits to the VA (see, e.g., AR 270, 314, 349, 354, 370, 459, 637, 649), no doctor or medical staff actually opined that he had a medical need for it, and he did not always use it for ambulation (see AR 358 (Sept. 25, 2013: observed "walking at a normal pace with appropriate arm swing, appropriate heel strike" and "[n]o obvious gait abnormality"), 682 (Jan 8, 2015: "[g]ait steady, able to move all extremities, left wrist in brace" but no cane mentioned)). At his kinesiotherapy discharge session in June 2014, he had "good mobility" for up to 20 seconds "without a gait aid" but "require[d] a gait aid" for ambulation over 30 seconds (AR 805); the kinesiotherapist noted that he "was unable to tolerate all exercises toward the end of his treatment sessions due to dizziness" (id.) and found that he had "good" balance when sitting and "fair" balance when standing (AR 806). Plaintiff, who is right-handed (AR 173), was observed to hold the cane in his left, nondominant hand (AR 637, 649).

In a neurology clinic appointment on February 19, 2015, it was noted that Plaintiff's "[c]hronic daily" headaches were "transformed by [his] analgesic overuse," he had "never titrated

up" his analgesic medication as he was instructed to do,[11] and he
had been without his medication for a month.  (AR 635-38.)

Other than a May 2014 abnormal ultrasound and an October
2013 MRI of his spine that both revealed spleen "lesions most
likely represent[ing] benign hemangiomas" (AR 292, 317, 411-12,
874), Plaintiff's imaging results were generally normal or
unremarkable for his age (see, e.g., AR 408-09 (Nov. 14, 2013,
normal CT scan of head), 412-13 (Oct. 25, 2013, "unremarkable MRI
of the brain"), 416 (Oct. 11, 2013, unremarkable CT scan of
head), 417 (Sept. 25, 2013, wrist x-ray showing "no displaced
fracture or bone destruction" or "significant arthritis"), 363-64
(discussing Aug. 2013 x-rays of knees, feet, and spine, noting
"minimal," "mild to moderate," and "unremarkable" impressions),
417-18 (Aug. 28, 2013, foot x-ray showing "[n]o acute fracture
lines, dislocations[,] or bone erosions," with "mild"
degenerative joint disease), 418 (Aug. 28, 2013, right-foot x-ray
showing "mild" degenerative joint disease and "unremarkable" bone
mineralization, no "acute fracture lines, dislocations[,] or
joint effusions"), 418-19 (Aug. 6, 2013, lumbar-spine x-ray
showing "mild to moderate discogenic and degenerative changes"),
419-20 (Aug. 6, 2013, knee x-ray showing "[m]inimal early
degenerative changes . . . not out of proportion for patient's

---

[11] To "titrate" means to analyze volumetrically by a
solution (the titrant) of known strength to an end point.
Stedman's, supra, at 1839.  In the medication context, dosage is
"titrated up" to the recommended final dose according to a
schedule, with the patient taking a progressively higher dose of
the medication and the doctor adjusting the dose as indicated by
the outcome of the titration.  See Topamax Prescribing
Information, at 4-5, www/topamax.com/files/topamax.pdf (last
visited June 26, 2017) (showing recommended titration schedule
for Topamax when used to treat migraines).

age"), 420-21 (same), 421 (June 28, 2013, foot x-ray showing "evidence for mild degree of hallux valgus" but "no evidence for acute recent fracture or dislocation"), 421-22 (June 28, 2013, x-ray of ankle showing "soft tissue swelling" but "no evidence for fracture or dislocation"), 422 (June 25, 2013, cervical spine x-ray showing "degenerative changes" but no fracture)).

Plaintiff's imaging results were consistently interpreted to warrant only conservative treatment. (See, e.g., AR 270-71 (discussing Nov. 14, 2013 CT findings and recommending continuing physical therapy), 241-42 (discussing Oct. 11, 2013 cervical-spine CT and recommending home exercise and rehabilitation), 254-55 (discussing Oct. 11, 2013 cervical-spine CT and recommending physical therapy), 259-60 (same), 328-29 (discussing Oct. 11, 2013 cervical-spine CT and recommending physical therapy, home exercise, "hot/cold pack," TENS unit, and traction therapy).)

In a July 25, 2014 physical-therapy session, it was noted that a "lesi" consultation was "pending" (AR 775), which apparently is a "lumbar epidural steroid injection" (J. Stip. at 7), but Plaintiff had not had any pain injections as of the April 1, 2015 hearing (AR 40).

On February 10, 2014, state-agency medical consultant Dr. E. Christian[12] completed the physical portion of the disability determination for Plaintiff's DIB claim. (AR 62-64, 67-70.) After reviewing the medical evidence, which included Plaintiff's

---

[12] Dr. Christian's signature line includes a medical-consultant code of "19," indicating "[i]nternal [m]edicine" (AR 74); see Program Operations Manual System (POMS) DI 24501.004, U.S. Soc. Sec. Admin. (May 5, 2015), https://secure.ssa.gov/poms.nsf/lnx/0424501004.

medical records through December 2013, Dr. Christian found that
Plaintiff would be able to "lift and/or carry" 20 pounds
occasionally and 10 pounds frequently, "stand and/or walk" about
six hours in an eight-hour workday, and sit about six hours in an
eight-hour workday. (AR 67.) Dr. Christian found that Plaintiff
had no limitations pushing and pulling; could frequently balance
and climb ramps and stairs; could occasionally climb ladders,
ropes, and scaffolds; and could occasionally stoop, kneel,
crouch, and crawl. (AR 67-68.)

On May 8, 2014, state-agency medical consultant Dr. L.C.
Chiang, a specialist in internal medicine, completed the physical
portion of the disability determination for Plaintiff's DIB claim
on reconsideration. (AR 73-75, 78-80, 83.) Dr. Chiang
considered additional evidence from Plaintiff's 2014 VA medical
records. (AR 76.) Dr. Chiang agreed with Dr. Christian's
assessment of Plaintiff's limitations. (AR 79.) Both Dr.
Christian and Dr. Chiang noted that Plaintiff had been observed
to ambulate with a single-point cane. (AR 61, 76.)

3. <u>Analysis</u>

Plaintiff argues that the ALJ erred in relying on the
opinions of the state-agency doctors. (<u>See</u> J. Stip. at 4-5.)
The ALJ found that Plaintiff could perform light work with six
hours of standing, sitting, or walking each day and some postural
limitations. (AR 16.) In assessing Plaintiff's physical
impairments, he gave "great weight" to the opinions of Drs.
Christian and Chiang. (AR 19.) He "also generously considered
[Plaintiff]'s subjective complaints of back and knee pain" and,
without finding those impairments to be severe, included postural

limitations in Plaintiff's RFC to account for them.  (AR 19-20.)

The opinions of Drs. Christian and Chiang were substantial evidence supporting the ALJ's RFC assessment because those opinions were consistent with each other and with the medical evidence.  See Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001) (although "opinion of a non-examining medical expert does not alone constitute a specific, legitimate reason for rejecting a treating or examining physician's opinion, it may constitute substantial evidence when it is consistent with other independent evidence in the record"); Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) ("reports of the nonexamining advisor need not be discounted and may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it").

As an initial matter, Plaintiff fails to identify an opinion by a treating or examining physician that contradicts the state-agency doctors' opinions or the ALJ's RFC assessment.  Plaintiff mainly cites his own subjective complaints (see, e.g., J. Stip. at 5 (citing Plaintiff's subjective reports of low-back, knee, right-ankle, foot, and neck pain), 6-7 (citing Plaintiff's subjective reports that he spent "a lot of time in bed with minimum physical activity," was not able to complete his home exercise program, suffered from daily migraine headaches, had difficulty with his school work, could not ride a bike because of balance issues, had a "pain level" of "8 out of 10," had difficulty sleeping because of his pain, had "bad days with his low back")), but as discussed in more detail in Section V.A., the ALJ properly discounted the credibility of Plaintiff's subjective

24

symptom complaints. The ALJ need not factor properly rejected evidence or subjective complaints into an RFC assessment. See Bayliss, 427 F.3d at 1217.

Plaintiff also points to diagnostic imaging results to support his argument (see J. Stip. at 5 (discussing CT and MRI of cervical spine), 6 (discussing MRI of lumbar spine), 7 (discussing x-rays of feet)), but as the ALJ noted (AR 15-16, 18), his imaging results were generally normal or unremarkable for his age (see AR 408-09, 412-13, 417-22) and were consistently interpreted by the doctors and medical staff to warrant only conservative treatment (see AR 241-42, 254-55, 259-60, 270-71, 328-29, 363-64). Indeed, Plaintiff cites evidence of "degenerative changes" in his spine (J. Stip. at 5-6), which the ALJ clearly considered by accurately describing those test results as showing "minimal early degenerative changes" and "mild to moderate discogenic and degenerative changes" (see, e.g., AR 15-16). Substantially normal diagnostic imaging results and conservative treatment can be substantial evidence supporting an ALJ's RFC assessment.[13] See Villarreal v. Colvin, No. 5:15-CV-02602 (VEB), 2016 WL 6768902, at *4 (C.D. Cal. Nov. 11, 2016) (substantial evidence supported ALJ's RFC finding when he "provided a detailed discussion of the clinical findings and diagnostic imaging[,] . . . all of which were within normal limits," and "noted that Plaintiff received conservative

---

[13] "Nearly everyone experiences some disc degeneration after age 40." Degenerative Back Conditions, Cleveland Clinic, http:// my.clevelandclinic.org/services/orthopaedics-rheumatology/ diseases-conditions/degenerative-back-conditions (last visited June 26, 2017).

treatment"); see also Walter, 2011 WL 1326529, at *3.

Plaintiff argues that the ALJ erred in failing to incorporate his "use of a cane" into his RFC. (J. Stip. at 8.) But Plaintiff himself requested the cane; no doctor opined that he actually needed one. (See AR 388, 384-85.) Indeed, the record does not contain any "medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, [or] describing the circumstances for which it is needed." See SSR 96-9p, 1996 WL 374185, at *7. Plaintiff requested the cane (AR 388) and was issued one even though "[h]e did not display any signs of balance issues" (AR 384-85). On August 28, 2013, Plaintiff's physical therapist noted that his "Ambulatory/Prosthetic Equipment Needs" were "tba" and that the plan for physical therapy was that he "[r]eturn to community distance ambulation with or without" an assistive device. (AR 374-76.) Plaintiff didn't follow instructions to increase his walking because he "didn't feel like it." (AR 320.) And Plaintiff apparently did not always use a cane for ambulation. (See AR 358 (Sept. 25, 2013, observed "walking at a normal pace with appropriate arm swing, appropriate heel strike," and "[n]o obvious gait abnormality"), 682 (Jan. 8, 2015, "[g]ait steady, able to move all extremities, left wrist in brace" but no cane mentioned).) The record reflects Plaintiff's subjective desire to use a cane and various observations that he used one, which is not sufficient to support incorporating a cane into his RFC. See Durfee, 2017 WL 877272, at *5.[14]

_____

[14] Even if the ALJ erred in failing to include Plaintiff's use of a cane into his RFC, any error was likely harmless. At

26

Plaintiff further argues that the ALJ erred in failing to mention his "lumbar spine condition," "cervical spine" restrictions, or "the frequency and duration of rest breaks required as a result of [his] chronic headaches." (J. Stip. at 8.) The ALJ considered Plaintiff's allegations of "lumbar strain" and "osteoarthritis of the knee" but found that those impairments "cause[d] only a slight abnormality that would have no more than a minimal effect on his ability to work." (AR 15.) In making that finding, the ALJ reviewed the diagnostic imaging and other medical records and found that "[n]o aggressive treatment was recommended or anticipated" for those conditions. (AR 15-16.) The record is consistent with the ALJ's and state-agency doctors' findings that Plaintiff did not suffer from severe lumbar- or cervical-spine impairments, or that he would require rest breaks as a result of his headaches. Indeed,

---

the hearing, the VE classified Plaintiff's past work as that of an insurance agent, DOT 250.257-010, 1991 WL 672355, a light-work job that was "sedentary exertional as performed" by Plaintiff. (AR 54.) Plaintiff does not contest the VE's classification of his past relevant work or his or the ALJ's finding that Plaintiff performed the job at the sedentary level. Even when medically required, use of a cane does not preclude sedentary work. See Harris, 2009 WL 2912655, at *4 n.5. Plaintiff alleged that he needed a cane for "balance issues" (AR 51), which he has had since at least 1998 (AR 322). And although he now apparently uses a cane, he is right-handed and holds his cane in his left hand. (AR 637, 649.) Because Plaintiff was able to perform the work of an insurance agent in a sedentary manner in 1998 when his balance problems began and continued to work in that job until 2011 (see AR 180), it would be reasonable to conclude that he could perform the work even needing a cane, especially because the cane was held in his nondominant hand. See White, 2011 WL 5373971, at *8 (discussing vocational expert's opinion that cane use in dominant hand precluded certain jobs).

Plaintiff does not identify any medical opinion finding that he had a severe "lumbar spine condition" that "has impacted his ability to engage in sitting activities," he suffered from a severe cervical-spine impairment, or his headaches would require that he take frequent breaks (J. Stip. at 8), and the Court's review of the medical record does not reveal any. Moreover, Plaintiff has not directly challenged the ALJ's step-two finding that any such impairments were not severe. The ALJ need not take into account properly rejected evidence or allegations that have no support in the record. See Bayliss, 427 F.3d at 1217.

Finally, Plaintiff argues that because Drs. Christian and Chiang reviewed his medical records only through April 17, 2014, their opinions have "less probative value." (J. Stip. at 8.) But Plaintiff fails to identify any medical record from after that date that contradicts the ALJ's RFC findings. Indeed, Plaintiff's more recent medical records do not reflect a "progression" of Plaintiff's physical impairments, as he suggests. (Id.) Between April 2014 and March 2015, except for a four-month break for a trip to Vietnam, Plaintiff continued to visit the VA for his regular kinesiotherapy, physical-therapy, psychology, tai chi, and various group-therapy sessions. (See generally AR 628-862.) In January 2015, he presented with a steady gait and no cane (AR 682); he continued with physical therapy and was advised to exercise, sleep, and use a heating pad (AR 690). He reported that "things [were] going well" in February 2015 but that he had been without one of his medications

for a month (AR 648); it was noted that his noncompliance with medication instructions was a likely cause of his aggravated headaches (AR 638). Thus, the medical records do not support a finding that Plaintiff's conditions were progressively getting worse or had in fact become disabling.

The findings of the state-agency doctors are not contradicted by the medical record; in fact, the record supports them. Accordingly, those opinions amount to substantial evidence in support of the ALJ's RFC assessment, and Plaintiff is not entitled to remand on this ground. See Saelee, 94 F.3d at 522.

**VI. CONCLUSION**

Consistent with the foregoing and under sentence four of 42 U.S.C. § 405(g),[15] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner, DENYING Plaintiff's request for remand, and DISMISSING this action with prejudice.

DATED: June 28, 2017

_____
JEAN ROSENBLUTH
U.S. Magistrate Judge

---

[15] That sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

29